2004 WY 118

**Harold Robert WHITNEY, Jr., Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 03–34.

Supreme Court of Wyoming.

Oct. 21, 2004.

Representing Appellant: Kenneth M. Koski, Public Defender; Donna D. Domonkos, Appellate Counsel; and Tina N. Kerin, Senior Assistant Appellate Counsel.

Representing Appellee: Patrick J. Crank, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Dee Morgan, Assistant Attorney General.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

VOIGT, Justice.

[¶ 1] Harold Robert Whitney, Jr. (the appellant) appeals his convictions for aggravated homicide by vehicle, a felony, in violation of Wyo. Stat. Ann. § 6–2–106(b)(i) (LexisNexis 2003), and several misdemeanors. On appeal, the appellant contends that he was denied a speedy trial, the prosecution suppressed or failed to preserve exculpatory evidence, a crime scene photograph was improperly admitted into evidence, and the prosecutor committed misconduct during opening statement and closing argument. We affirm.

## ISSUES

1. Whether the appellant was denied a speedy trial pursuant to W.R.Cr.P. 48(b) or the United States or Wyoming Constitutions?

2. Whether the prosecution suppressed or failed to preserve exculpatory evidence?

3. Whether a photograph of the deceased victim's body at the crime scene was improperly admitted into evidence?

4. Whether the prosecutor committed misconduct during opening statement and closing argument?

## FACTS

[¶ 2] At about 2:00 a.m. on September 29, 2001, Officer Michael Vranish of the Evanston police department encountered a green

Pontiac minivan (the minivan) at an intersection controlled by a flashing red stoplight. The minivan stopped once it had entered the intersection entirely, remained stopped in the intersection for at least ten seconds, proceeded through the intersection, drove well below the posted speed limit for a brief period of time, and failed to signal its turns. Officer Vranish, suspecting that the minivan's driver might be impaired, initiated a traffic stop shortly thereafter. Officer Vranish requested that the minivan's driver, who the officer identified at trial as the appellant, produce his driver's license, registration, and proof of insurance. The appellant produced a plastic "Hertz Car Sales" "club card entitling the holder to certain [VIP] benefits" bearing the name "Bobbie Decker." [1]

[¶ 3] Officer Vranish testified that he smelled the odor of an alcoholic beverage on the appellant's breath, the appellant had bloodshot eyes, appeared "really tired," did not communicate or respond well, and was slow and deliberate in attempting to produce the requested documentation (which documentation he ultimately failed to produce). Officer Vranish returned to his patrol vehicle in order "to find out who [he] was dealing with" and did not consider the appellant to be a flight risk at that time.

[¶ 4] The minivan then suddenly pulled away from the scene of the traffic stop, failed to stop at a stop sign, and began to exceed the posted speed limit.[2] Officer Vranish pursued the minivan and from a point approximately six hundred feet behind the minivan, Officer Vranish saw "a cloud of dust" as the minivan lost control and traveled off the side of the road. The appellant exited the minivan, looked at Officer Vranish, ignored the officer's order to "get on the ground," and took off running. While Officer Vranish and another police officer subdued the appellant, Evanston police officer Chris Brackin walked to the front of the minivan, looked through a hole in the windshield, and saw a male body positioned with his head near the passenger seat and his lower body near the windshield

opening. The body, later identified as Donald Walker (the victim), had no pulse. According to Officer Vranish, the entire pursuit lasted about a minute.

[¶ 5] Wyoming Highway Patrol Trooper Richard Lewis investigated the crime scene with the assistance of David Lankford, a Wyoming Highway Patrol Trooper at the time. Trooper Lewis determined that the minivan the appellant was driving during the pursuit jumped the curb on a curve in the roadway, struck the victim (who was walking on the sidewalk) 229 feet later, struck a light pole, impacted a traffic island, and came to rest in the roadway approximately 629 feet from the point it jumped the curb. The minivan struck the victim with such force that it "knocked" the victim "out of his shoes" and the victim's severed left foot came to rest against a fence about 270 feet from the point of impact. Trooper Lankford opined that the appellant's response to the curve in the roadway was "late. He started into the turn but it wasn't until after the turn had already started, so he was going straight and then started his turn too late, which caused him to go off the roadway and on to the sidewalk." According to Trooper Lankford, the minivan's minimum speed when it jumped the curb was seventy miles per hour and the average speed during the pursuit was seventy-five miles per hour.

[¶ 6] A blood sample was obtained from the appellant on September 29, 2001, which sample contained an alcohol content of .27%. Officer Vranish and Trooper Lewis testified that the appellant, who was from Elko, Nevada, stated that after he was unable to locate some friends in Evanston, he went out drinking at two establishments and was driving back into town when Officer Vranish stopped him.

[¶ 7] At trial, the appellant's defense focused on: (1) Officer Vranish's actions in returning to his patrol vehicle to attempt to identify the appellant instead of taking steps to control the appellant and/or the minivan

---

1. The record indicates that Bobbie Decker, a female, is the appellant's fiancé.

2. Evanston police officer Chris Brackin testified that he was traveling seventy miles per hour while following the vehicles involved in the pursuit (from a distance), and the other vehicles "were traveling at speeds greater than I was traveling."

and prevent the appellant from driving;[3] and (2) the possibility that Officer Vranish, perhaps via a "pit maneuver,"[4] forced the appellant off the road during the pursuit prior to the minivan striking and killing the victim.[5] The appellant contended at trial that these actions amounted to extreme and outrageous conduct, and therefore proximately caused the victim's death.

[¶ 8] The appellant was ultimately charged in an Amended Information with aggravated homicide by vehicle, a felony, in violation of Wyo. Stat. Ann. § 6–2–106(b)(i), and eluding, in violation of Wyo. Stat. Ann. § 31–5–225 (LexisNexis 2003), reckless driving, in violation of Wyo. Stat. Ann. § 31–5–229 (LexisNexis 2003), driving while under the influence, in violation of Wyo. Stat. Ann. § 31–5–233(b)(ii)(A) (LexisNexis 2001), two counts of interference with a peace officer, in violation of Wyo. Stat. Ann. § 6–5–204(a) (LexisNexis 2003), and driving while license suspended or revoked, in violation of Wyo. Stat. Ann. § 31–7–134(a) (LexisNexis 2003), all misdemeanors. On April 22, 2002, the

State moved to dismiss the reckless driving charge without prejudice, which motion was granted. On October 11, 2002, a Uinta County jury found the appellant guilty of the remaining charges. The district court sentenced the appellant to imprisonment for eight to twelve years for aggravated homicide by vehicle, and also imposed sentence for several of the misdemeanor convictions.[6] The appellant appeals from the district court's judgment and sentence.

## DISCUSSION

*SPEEDY TRIAL*

[¶ 9] The appellant was arrested on September 29, 2001, and the public defender was appointed to represent him on October 1, 2001. On October 1, 2001, the prosecution filed an Information in the circuit court charging the appellant, followed by an Amended Information on October 17, 2001. A preliminary hearing was held on October 11, 2001, and the appellant was bound over to the district court for further proceedings. The appellant was arraigned in the district

---

3. Robert LaPier, an expert witness for the appellant, testified that Officer Vranish should have asked the appellant to exit the minivan to perform field sobriety tests, or otherwise controlled the vehicle and/or its driver to "prevent [him] from driving." Mr. LaPier concluded that it was not reasonable or prudent for Officer Vranish to return to his patrol vehicle and attempt to identify the appellant under the circumstances.

4. A "pit maneuver," as described by Officer Vranish, is when a police vehicle comes alongside a suspect vehicle, makes soft contact between the police vehicle's front bumper and the rear quarter panel of the suspect vehicle, pushes the back wheels of the suspect vehicle away from the line of traffic, and sends the suspect vehicle into an uncontrollable skid to stop the vehicle. Officer Vranish was the only Evanston police officer trained to perform the pit maneuver and was qualified to instruct others on how to perform the maneuver, but Evanston police officers were not allowed to perform the maneuver because the department had not implemented any policies for doing so.

5. Officer Vranish testified that he did not perform a pit maneuver on the minivan, nor did he see any "Evanston patrol vehicle" come into contact with the minivan during the pursuit. Officer Vranish estimated that he was 600 feet behind the minivan when he saw the cloud of dust.

Evanston police officer John Evans, who was driving behind Officer Vranish during the pursuit, never saw Officer Vranish's vehicle contact the minivan, and when he observed the cloud of dust at the end of the pursuit, Officer Vranish's vehicle was approximately fifty to seventy yards behind the minivan and never close enough to the minivan for physical contact.

A narcoleptic taxi driver testified for the appellant and stated that although she didn't "know," she would "guess" that the distance between the police vehicle and the minivan ranged anywhere from about "a half block," to "a car and a half," to twenty-eight feet.

Trooper Lewis testified that at "the speeds involved, the damage to the [minivan's] left quarter panel would have been much, much worse than" what he observed on the minivan. When asked if, during the course of his investigation, Trooper Lewis located any evidence that indicated the minivan had been forced off the road, Lewis replied "None." Trooper Lankford testified that if Officer Vranish had used a pit maneuver to stop the minivan, he would expect to see tire marks in the roadway because "scuff marks or skid marks ... will come from that type of a maneuver." No one apparently observed marks of this nature at the crime scene.

6. Based on the prosecutor's position at sentencing that the driving while under the influence conviction merged with the aggravated homicide by vehicle conviction, the appellant was not sentenced for driving while under the influence.

court on October 31, 2001, where he pled not guilty, and following several trial continuances, a jury trial was held October 8–11, 2002.

[¶ 10]   The appellant argues that he was denied a speedy trial under W.R.Cr.P. 48, Wyo. Const. art. 1, § 10, and the Sixth Amendment to the United States Constitution. "We review a speedy trial claim according to the mandates of W.R.Cr.P. 48(b) and, where necessary, the four-part constitutional test articulated in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)." *Vlahos v. State*, 2003 WY 103, ¶ 12, 75 P.3d 628, 632 (Wyo.2003). "W.R.Cr.P. 48 governs the time period between arraignment and trial; however, delays between the time of charge and the time of trial are subject to the Sixth Amendment to the United States Constitution." *Walters v. State*, 2004 WY 37, ¶ 9, 87 P.3d 793, 795 (Wyo.2004). We note that on appeal, the appellant does not contend that his trial counsel was ineffective at any time during the trial court proceedings.

## Continuances of January 30, 2002, and April 3, 2002, Trial Dates

[¶ 11]   In an order filed November 14, 2001, the district court set the case for a jury trial beginning January 30, 2002. Based on his preliminary discussions with the appellant in October 2001, and "on Mr. Whitney's demand," the appellant's trial counsel (trial counsel) developed a theory that Officer Vranish improperly focused on ascertaining the appellant's identity during the traffic stop, rather than on removing the appellant from the minivan or otherwise disabling the minivan. According to this theory, Officer Vranish's conduct was extreme and outrageous and therefore proximately caused the victim's death. Trial counsel informed the appellant that this was a "difficult" defense, but the appellant insisted on "pushing this defense on" trial counsel. In mid-December, trial counsel considered consulting an expert on driving while under the influence arrest procedures and contacted Robert LaPier.

The two discussed Mr. LaPier's fees, and trial counsel submitted case materials to Mr. LaPier for his review.

[¶ 12]   Trial counsel also stated that even before he was "assigned the case" (and certainly before the October 11, 2001, preliminary hearing), he "heard rumors in the general community and one of the rumors was that the police officers h ad actually bumped . . . the [appellant's] vehicle and had bumped the vehicle off the road, causing it to run into the pedestrian." Recognizing "the seriousness of the allegations" and "the seriousness of the rumor," trial counsel preliminarily developed another theory that the police "bumped" the appellant's vehicle during the pursuit. Trial counsel contacted an investigator, who went to the crime scene, obtained and examined the police reports, interviewed people who worked in the area, and according to trial counsel, even talked to "the police." The police told the investigator

> that they were inspecting their vehicles and they were taking photos and those photos could be made available to him. Honestly, I don't know if [the investigator] told [trial counsel] that or not, that there were—I believe he told me that he had talked with the police and there was no damage to the vehicles. I don't know if he transmitted to me the idea that there were actual photos of the police vehicles.

Neither trial counsel, nor the investigator, examined the minivan at that time. Based on this investigation, the investigator concluded that there was "simply no evidence of any kind of contact between the police vehicle and the [appellant's] vehicle" and trial counsel concluded that there was not "a scintilla of evidence to suggest that the police officer's vehicle had come into contact" with the minivan and "dropped that defense strategy" in October or November of 2001.[7]

[¶ 13]   Just prior to Christmas, the public defender's office authorized trial counsel to retain Mr. LaPier, and trial counsel relayed that information to the appellant. Trial counsel felt that "it was likely we would have to request a continuance of the January 30

---

7.  Trial counsel also recalled that a police officer testified, likely at the preliminary hearing, that the police officers that pursued the appellant never "got that close" to the minivan during the pursuit.

trial date" and stated that the appellant did not appear "happy with that." In early January 2002, trial counsel also requested, and participated in, a discovery meeting with the prosecution, where he met with law enforcement officers from several agencies, received documents, and listed additional discovery items to be provided by the prosecution. To that point, trial counsel felt that the prosecution had "complied with discovery. Everything I've requested of them has been provided to me and I've been satisfied with what I've received from the State."

[¶ 14]  On January 17, 2002, a "Joint Motion For Continuance" was filed by the appellant, "through his attorney," and the prosecutor. The motion, signed by trial counsel and the prosecutor, stated that the appellant had "acquired the services of an expert witness, who is not available to testify on the date presently set for trial," that the "parties" needed additional time to "complete discovery," and requested that the trial be continued until after March 15, 2002, "to allow sufficient time for the parties to complete the discovery process." Trial counsel stated, however, that he

> felt it was in [the appellant's] best interest to request a continuance and I requested a continuance. I got with [the prosecutor]. I asked if he had any problem with the continuance of the January 30 case. I told him why and he had no objection. I made it a joint motion. We filed it with the Court.

The district court, finding "just cause" for the motion, vacated the January 30th trial setting and reset the matter for trial on April 3, 2002. According to trial counsel, the district court did not consult trial counsel prior to issuing this trial setting. Upon receiving the setting, trial counsel immediately called Mr. LaPier and discovered that he was not available to testify during the April 3, 2002, setting.

[¶ 15]  On March 12, 2002, trial counsel and the prosecutor filed a second "Joint Motion To Continue Jury Trial." The motion, signed by trial counsel and the prosecutor, stated that the appellant's expert witness,

Mr. LaPier, was not available to testify during the April 3rd trial setting, but would be available to testify if the trial were rescheduled for April 24, 2002.[8] The district court continued the April 3rd trial setting and reset the trial for April 24, 2002.

[¶ 16]  The relationship between the appellant and trial counsel had admittedly become "strained," and according to counsel, the appellant "wasn't communicating with me." This is evident in the record, as the appellant began filing ex parte, pro se motions with the district court complaining about the appellant's relationship with trial counsel and also in response to the above-described motions to continue the trial.

[¶ 17]  On February 21, 2002, the appellant filed several documents with the district court. In a handwritten letter, styled as a "Motion To Appeal Continuance," the appellant stated that trial counsel was "acting on his own behalf" in requesting the January 17th continuance, that the appellant had "never waived" his right to a speedy trial and "I want my right to a speedy trial," and that trial counsel had "been given sufficient amount of time to prepare himself for my defense."

[¶ 18]  On March 28, 2002, the appellant filed a Motion for Appointment of Counsel, wherein he requested that the district court remove "conflicted" trial counsel. In an affidavit attached to the motion, the appellant stated that his "right to a fast and speedy trial was waived solely by [the public defender]" and the appellant did not "consent freely to this waiver" because trial counsel informed the appellant that the continuance "was required due to the fact that my counsel needed extra time to prepare an expert witness in my defense" and a local newspaper article stated that it was the prosecution's expert witness, not the appellant's, that needed "extra time to prepare." In a February 27, 2002, letter, Lois Whitney (the appellant's mother) stated that in addition to this newspaper article, she spoke with a private attorney regarding the case and he "related" that

---

8.  According to trial counsel, who "still wanted the trial within the 180 days," the April 24th trial date was coordinated between trial counsel, the prosecutor, and the district court.

the "expert witness was for the prosecution." According to trial counsel, however,

> I would note that I did not speak to the newspaper when they ran the article. I don't believe even [the prosecutor] spoke to the newspaper but, somehow, the newspaper made it sound like it was a prosecutor's request for continuance. I've explained on more than one occasion that that was not the case, that the continuance was due to the fact that we were hiring Mr. LaPier as the Defense's expert witness.
>
> And so at this point in time, on this motion, ... what they're saying is I was working in collusion with [the prosecutor]; and I will categorically deny that. The only thing I was working with [the prosecutor] on was getting this on the Court's docket in a timely manner.

[¶ 19] On April 4, 2002, the appellant filed a Motion to Appeal Continuance that was actually dated February 19, 2002, which motion mirrored his February 21, 2002, filing. On April 5, 2002, the appellant filed a Motion for Discovery requesting the "police record of Officer Vranish and any and all records pertaining to the patrol car that is identified as in pursuit of the Defendant on September 29, 2001" and a hearing on his pending motions.

[¶ 20] On April 22, 2002, the appellant filed a motion to dismiss because the prosecution allegedly allowed the minivan "to be lost improperly concealed and/or destroyed." According to the motion, "damage to the rear end side to the vehicle and markings on the vehicle can only indicate that [the] vehicle was struck from behind, prior to striking the victim," and without the minivan the appellant could "not defend himself against the charges...."

[¶ 21] At some point, due to these filings, trial counsel sought his supervisor's assessment of the circumstances, and co-counsel was appointed. Trial counsel stated that he had a "total lack of communication" with the appellant as early as March 2002, and the appellant was "angry," "wouldn't speak to me completely," and "got up and left the room and wouldn't prepare for trial, basically." There is some indication in the record that the situation began to improve once co-counsel was appointed.

### Continuance of April 24, 2002, Trial Date

[¶ 22] The district court held a hearing April 23, 2002, to address the appellant's pending motions and determined at the outset that the appellant was not under the influence of alcohol or drugs and did not suffer from any mental impairment that would interfere with his ability to understand the proceedings. The appellant informed the district court that within the "past two weeks," the appellant discovered that the minivan had been "destroyed," photographs of the minivan "were never looked into," there were "rumors that the police knocked me off the road, causing me to strike the pedestrian" and the police department had investigated those rumors. The appellant stated that this information "wasn't brought out to me."

[¶ 23] In order to receive further information from trial counsel on the issue, the district court excluded everyone except the appellant, trial counsel and co-counsel, the bailiff, and the court reporter, from the hearing. At this point, trial counsel detailed his understanding of what had occurred throughout the case, including the evolution of the defense's trial strategy. Much of what trial counsel stated is contained in our prior discussion of the facts leading up to this point in the proceedings.

[¶ 24] With respect to the minivan specifically, trial counsel stated that he had received the crime scene photographs of the minivan, but did not notice the rear end damage ("scrape marks" on the minivan's right rear quarter panel) depicted in the photographs until the appellant "brought it to my attention within the last couple of weeks." Counsel noted that "what I saw [in the photographs], your Honor, is not consistent with what I, as a lay person, believe would be consistent with a vehicle being bumped in the right, quarter panel."

[¶ 25] Trial counsel began looking into the matter further. He spoke with Lieutenant Mitch Allmaras and Chief Russell Harvey of the Evanston police department and

learned that they had investigated a rumor that one of the police vehicles involved in the pursuit had forced the appellant off the road. The officers inspected Officer Vranish's patrol vehicle within days after the incident and did not observe any physical damage to the vehicle. They also then had all of the patrol vehicles that were present during the pursuit photographed, and informed trial counsel that no physical damage to the vehicles was (or would be) evident in the photographs. The photographs apparently had not been developed, but trial counsel was assured that the photographs would be developed and provided to trial counsel. At the April 23, 2002, hearing, trial counsel added that he had been "working on trial preparation" and had not "had time to run over and get" the photographs from the police department.

[¶ 26] Trial counsel also demanded in writing that the prosecution produce the minivan. The minivan had been released from the prosecution's possession, but the prosecution located the minivan at a salvage yard in Nebraska. Trial counsel informed the district court that as a result, the minivan had been "produced" and was "available." He was even provided a digital photograph of the minivan situated at the salvage yard, and the "strafe mark" at issue was visible in the photograph. According to trial counsel, as of the April 23, 2002, hearing:

> We're to the point now, if Mr. Whitney wants to include this as part of his defense, we're ready, willing and able to include it as part of his [defense.] We're ready, willing and able to go to [Nebraska,] if we have to, load the van back on a flat bed, bring it back to Wyoming.... But, in essence, have someone look at not only those scrapes but look at the van for any other indications that it had been bumped[.] Quite frankly, I haven't done it before because there hadn't been a scintilla of evidence to suggest that, your Honor.

[¶ 27] The district court responded as follows:

> The reason I'm saying that, the fact that it's not discovered or whatever until later on, doesn't mean you're ineffective. That happens all the time. But the question now comes at this point, as I can see it is

... we're going to be starting a trial tomorrow. You've located the van. It would appear to me that at least to, as best you can, put your client's mind at ease, that the Defense, maybe, ought to have their own accident reconstruction expert review the reports and go look at the van, itself, and see if [Mr. Lankford] is right, you know, whether it looks like it's scraped by a building or whether it, in fact, was—and there may be tests that can be made on the scrapes to find out whether it's paint or cinder blocks or whatever else.

> . . .

> ... But the problem we've got is we're here on the eve of trial now, Mr. Whitney, and this is where I'm at. You can—in a sense, here's where you are. I mean, sometimes—the speedy trial right is primarily your right to have the case brought to a speedy conclusion, so you don't have the anxiety and the uncertainty of the charges hanging over your head. Now, you're, in a sense, sitting here, kind of on the horns of a dilemma.

> One, if you want a continuance for sufficient time to allow an examination of this stuff by a defense expert that may help you in trial, I'll grant it, you know, so that you can come to trial prepared.

> On the other hand, you may have concluded that your best defense is to whine about the quality of your defense attorney, thinking that you are just going to be convicted so you would rather start out doing that. But if you want to really try to defend your case, I'll grant a motion for a continuance, but you've got to ask for it. I'm not going to order it because you have a right to a speedy trial.

Trial counsel noted that he had informed the appellant that in order to pursue the matter further, it would entail a trial delay, and the appellant "refused, basically, to direct me to do that." The appellant then stated that he "just want[ed] a fair trial. I want my evidence brought up to my trial so I can see it." The following transpired:

> THE COURT: ... But it appears to me given where we are, at least with regard to the—you have a question in your own mind, at least, with regard to these

scrapes, whether or not they are caused by a collision or whether or not they're caused by scraping a building. And I think in fairness to you, in terms of where it is, you—that should be investigated by someone independent of the State's expert.

Again, here's where I'm at, though. If you were arraigned on October—what was it, the 29th?

[TRIAL COUNSEL]: 31st, your Honor.

. . .

[TRIAL COUNSEL]: April 30 would be the 180th day, your Honor.

THE COURT: And that's really where we're at. You can't have both. You can't have a speedy trial and be able to get the investigation done.

DEFENDANT WHITNEY: Yes, your Honor, I understand that. And based on that fact, you know, I wrote [trial counsel].. and I explained to him on January 30 and prior to January 30 that I wanted to go to trial. I wanted to get this investigation done. He said the case was being delayed because of an expert witness and because we needed the documents. . . .

THE COURT: Well, wait a minute. You're back, pointing your finger at your lawyer.

. . .

THE COURT: You're here, faced with a trial tomorrow, and you're not going to be able to present any evidence or do anything about that scrape other than have the photograph saying "Here's a scrape on this."

. . .

THE COURT: Now, let me finish. It's time for you to fish or cut bait. Whatever happened, I'm offering an opportunity to at least remedy part of what you're complaining about.

DEFENDANT WHITNEY: Okay.

. . .

THE COURT: All right. Mr. Whitney, I want to just explain one thing to you here. Your attorney has requested a continuance to have an expert review, essentially, your theory of defense; and it appears to me your most plausible theory of defense. . . .

. . .

THE COURT: Well, how much time, [trial counsel], are you going to need to have your expert review—examine the vehicle, review the photographs, review the reports of the other—the State's expert?

[TRIAL COUNSEL]: A minimum of sixty days, your Honor. . . .

. . .

THE COURT: Well, let me tell you one other thing, Mr. Whitney. You filed a motion to dismiss. I could grant that but it would be without prejudice. The State would refile again and start the whole process again. Do you understand what I'm saying?

DEFENDANT WHITNEY: Yes, your Honor. I do understand.

THE COURT: So denying that, I'm at least keeping the thing on. Either way, you're likely to be held in—you know, under the current bail situation. I think the best thing is just to move things along in terms of where we are.

. . .

THE COURT: . . . I just want to get one other matter, at least, with regard to him.

Given where we are, do you have any objection to—yourself, to us continuing the trial so that this investigation can be completed?

DEFENDANT WHITNEY: No, your Honor, I don't, just for the fact that my evidence can be brought into court. But the only objection I really have is the time of incarceration. . . . I still cannot come up with the money, your Honor. I have been in the jail.

The prosecutor was allowed back into the hearing, at which time the district court informed him that the appellant needed "about sixty days to—at least sixty days to complete that investigation, so they've asked for a continuance. The Defendant has agreed to that, although he has—and we're going to take that up—a concern about his bail."

[¶ 28]   The district court proceeded to address the appellant's remaining pending motions. The district court also considered bail,

substantially reduced the appellant's bail, and the appellant was apparently released from jail shortly thereafter.[9] The district court indicated that it would need "a written motion for a continuance and support it with an affidavit indicating the need to—because of the recent developments with regard to an expert."

[¶ 29] On April 26, 2002, the appellant, "by and through" trial counsel, filed a Motion to Continue Jury Trial, requesting that the April 24, 2002, trial date be continued. The motion stated that additional time was required "to have a vital piece of evidence, the mini-van driven by Defendant, examined by an accident reconstruction expert for the defense," that the minivan had been released by law enforcement "without consulting with Defendant," and pursuant to W.R.Cr.P. 48, requested a continuance to a "date to be determined by the Court." In an affidavit accompanying the motion, trial counsel additionally stated that he could "readily obtain the services of an expert in Nebraska to travel to the location of the mini-van and . . . conduct an examination of said vehicle for and on behalf of Defendant," that he believed this could "be accomplished within the next sixty (60) days," and that it was "essential to the defense of the case to have this additional time to conduct this investigation and examination." On May 1, 2002, the district court continued the April 24, 2002, trial setting, and reset the trial for July 17, 2002.

### Continuance of July 17, 2002, Trial Date

[¶ 30] On May 14, 2002, trial counsel requested that a trial subpoena be issued for Evanston Police Chief Russell Harvey. On June 12, 2002, the prosecution filed a motion to quash Chief Harvey's subpoena, or in the alternative to allow his testimony to be preserved by deposition, because Chief Harvey had previously scheduled a non-refundable trip to Alaska and would be unavailable to testify in person on July 17, 2002. The district court held a hearing on the motion on June 19, 2002 (within sixty days of the April 24, 2002, trial setting), during which hearing

the appellant's trial counsel opposed the motion. Trial counsel stated that Chief Harvey was a "vital witness" for the appellant, that it was "absolutely important" that he "testify in front of the jury," and that this was "the one area that Mr. Whitney and I agree on completely, that Chief Harvey is vital to our case and his presence in front of the jury is vital." According to trial counsel, a deposition would also "reveal trial strategy prematurely. . . ."

[¶ 31] In camera, trial counsel explained the appellant's trial strategy and Chief Harvey's "essential" role in regards to that strategy. At one point, the following colloquy occurred:

> [TRIAL COUNSEL]: . . . Now, one thing that I tried to bring up to the Court's attention in chambers is this idea of a continuance. I've discussed this and, again, I note that Mr. Whitney and I are in total agreement here that the Chief needs to be a witness in person in this case. And Mr. Whitney is so strong about that, even though he's had objections in the past—
>
> . . .
>
> THE COURT: Well, what do you say about a continuance?
>
> DEFENDANT WHITNEY: Well, I agree with [trial counsel]. I think . . . Chief . . . Harvey is critical to my case.
>
> THE COURT: No, what do you say about a continuance, aside from him?
>
> DEFENDANT WHITNEY: I agree with it. I want [Chief Harvey] to testify. And if his fishing trip—he made reservations two years prior, you know, it's not his fault or the Court's fault, you know. It just happened to fall on the date my trial was set.
>
> THE COURT: That's right.
>
> DEFENDANT WHITNEY: And I agree with that.
>
> [TRIAL COUNSEL]: So you would agree to a continuance?
>
> DEFENDANT WHITNEY: So yes, yes, I would agree, your Honor, to a continuance.

---

9. By April 26, 2002, the appellant was reporting to the detention center by telephone from Neva- da, as required by his bail conditions.

The district court concluded that the appellant "consented to continuing a trial if that is necessary, that—to put it fairly, the Defense would rather continue the trial rather than to have the testimony preserved by deposition." The district court did not rule on the motion at that time.

[¶ 32] In a June 21, 2002, letter to the district court, trial counsel informed the court of the dates Mr. LaPier would be available to testify for the appellant if the district court decided to continue the trial, and noted that the "month of October appears to be very open for Mr. LaPier, and certainly a trial date in that month would mean both parties would have ample time to line up all of their witnesses. I hope the Court will consider an October trial date." The letter also stated that "Mr. Whitney is not opposed to a continuance."

[¶ 33] On July 10, 2002, it appears that the appellant (by and through trial counsel) and the prosecutor formalized what occurred at the June 19, 2002, hearing and filed a Joint Motion to Vacate Pretrial Conference and Jury Trial and Reset for a Later Date. The motion, signed by trial counsel and the prosecutor, states that Chief Harvey would be unable to testify at the July 17, 2002, trial setting. In a July 11, 2002, order, the district court found "just cause" to grant the motion, vacated the July 17, 2002, trial setting, and reset the case for trial October 8, 2002.

**W.R.Cr.P. 48**

[¶ 34] The appellant claims that he "affirmatively asserted" his right to a speedy trial and we should therefore dismiss this case, with prejudice, pursuant to W.R.Cr.P. 48(b)(7). "In recognition that W.R.Cr.P. 48 provides criminal defendants a procedural mechanism to ensure the protection of [the constitutional right to a speedy trial], we have held that compliance with its terms is mandatory." *Taylor v. State*, 2001 WY 13, ¶ 8, 17 P.3d 715, 718 (Wyo.2001). W.R.Cr.P. 48(b) reads as follows:

*Speedy trial.—*

(1) It is the responsibility of the court, counsel and the defendant to insure that the defendant is timely tried.

(2) A criminal charge shall be brought to trial within 180 days following arraignment unless continued as provided in this rule.

(3) The following periods shall be excluded in computing the time for trial:

(A) All proceedings related to the mental illness or deficiency of the defendant;

(B) Proceedings on another charge;

(C) The time between the dismissal and the refiling of the same charge; and

(D) Delay occasioned by defendant's change of counsel or application therefor.

(4) Continuances exceeding 180 days from the date of arraignment may be granted by the trial court as follows:

(A) On motion of defendant supported by affidavit; or

(B) On motion of the attorney for the state or the court if:

(i) The defendant expressly consents;

(ii) The state's evidence is unavailable and the prosecution has exercised due diligence; or

(iii) Required in the due administration of justice and the defendant will not be substantially prejudiced; and

(C) If a continuance is proposed by the state or the court, the defendant shall be notified. If the defendant objects, the defendant must show in writing how the delay may prejudice the defense.

(5) Any criminal case not tried or continued as provided in this rule shall be dismissed 180 days after arraignment.

(6) If the defendant is unavailable for any proceeding at which the defendant's presence is required, the case may be continued for a reasonable time by the trial court but for no more than 180 days after the defendant is available or the case further continued as provided in this rule.

(7) A dismissal for lack of a speedy trial under this rule shall not bar the state from again prosecuting the defendant for the same offense unless the defendant made a

written demand for a speedy trial or can demonstrate prejudice from the delay.

The appellant does not argue that the written motions to continue the trial failed to comply with W.R.Cr.P. 48.

[¶ 35] We find that the district court continued the April 24, 2002, trial setting (the last trial setting within 180 days of the appellant's arraignment) in accordance with W.R.Cr.P. 48(b)(4)(A). Trial counsel requested a sixty-day (minimum) continuance during the April 23, 2002, motion hearing in order to further investigate the scrape marks depicted in the crime scene photographs of the minivan and retain an expert to examine the minivan "for any other indications that it had been bumped" during the pursuit. The district court clearly informed the appellant that he could exercise his right to a speedy trial and proceed to trial as scheduled on April 24, 2002, or a trial continuance beyond the 180–day period could be requested to examine the minivan. The appellant, who wanted a "fair trial" and his "evidence brought up to ... trial" and "into court," stated on the record that he did not object to a trial continuance for this purpose. When the appellant simultaneously expressed a concern about his ability to meet the current bail conditions, the district court addressed bail, reduced the appellant's bail, and the appellant was released shortly thereafter. Based on what occurred at the hearing, trial counsel filed a formal motion to continue the trial, which motion was supported by an affidavit.

[¶ 36] The appellant argues that he did not waive his right to a speedy trial and "[a]ny waiver implied by [the appellant's] statements was so coerced by the trial court and by his own counsel as to be meaningless." According to the appellant, there "was not a shred of voluntariness in [the appellant's] coerced acquiescence to a continuance past the 180 day period." Conspicuously absent from these bald characterizations is an articulation of how the appellant's consent to continue the trial was "coerced." "We have consistently held that we will not consider claims unsupported by cogent argu-

ment...." *Barkell v. State*, 2002 WY 153, ¶ 32, 55 P.3d 1239, 1245 (Wyo.2002).

[¶ 37] The appellant further argues that the district court misled the appellant when it stated that if it dismissed the case on April 23, 2002, the case could be refiled. According to the appellant, this statement was incorrect under W.R.Cr.P. 48(b)(7), and any waiver of his speedy trial right was therefore based on an "erroneous advisement." The district court made the statement at issue in discussing the appellant's motion to dismiss the case because the prosecution allegedly allowed the minivan to be "lost improperly concealed and/or destroyed" and the appellant could not "defend himself" without the minivan.[10] The effect of a dismissal based on that particular motion, even if we assume for purposes of this appeal that the district court's statement was erroneous, clearly was of little consequence. The district court denied the appellant's motion twice on the record prior to the point in the hearing that appellant stated that he did not object to continuing the April 24, 2002, trial setting.

[¶ 38] We find that the district court also continued the July 17, 2002, trial date in accordance with W.R.Cr.P. 48(b)(4)(A). While the appellant states in passing that he was essentially "forced" to agree to this continuance because the April 24, 2002, trial setting was continued and Chief Harvey apparently was available to testify in person at that time, the appellant focuses his appellate argument on what occurred during the April 23, 2002, hearing and does not present cogent argument on the merits of continuing the July 17, 2002, trial date pursuant to W.R.Cr.P. 48.

**United States and Wyoming Constitutional Provisions**

[¶ 39] This Court examines de novo the constitutional question of whether a defendant has been denied a speedy trial in violation of the Sixth Amendment....

The Sixth Amendment guarantees that the accused shall enjoy the right to a speedy and public trial. In deciding

---

10. By the April 23, 2002, hearing, of course, the prosecution had located the minivan in Nebraska

and the minivan was available to the appellant for further examination.

whether a defendant has been denied a speedy trial, courts must balance 1) the length of the delay; 2) the reason for the delay; 3) the defendant's assertion of his right; and 4) the prejudice to the defendant. *Warner [v. State*, 2001 WY 67,] ¶ 10, [28 P.3d 21, 26 (Wyo.2001) ], *Campbell v. State*, 999 P.2d 649, 655 (Wyo.2000); *Barker v. Wingo*, 407 U.S. 514, 530, 533, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972). None of these factors alone is sufficient to establish a speedy trial violation, "[r]ather they are related factors and must be considered together with such other circumstances as may be relevant." *Barker*, 407 U.S. at 533, 92 S.Ct. at 2193. "The determinative dynamic in our inquiry is whether the delay in bringing the accused to trial was unreasonable, that is, whether it substantially impaired the right of the accused to a fair trial." *Warner*, ¶ 10, *Wehr v. State*, 841 P.2d 104, 112 (Wyo.1992). When a speedy trial violation is found to have occurred, the charges must be dismissed. *Warner*, ¶ 10; *Barker*, 407 U.S. at 522, 92 S.Ct. at 2188.

*Walters*, 2004 WY 37, ¶¶ 9–10, 87 P.3d at 795. *See Wehr v. State*, 841 P.2d 104, 111–12 (Wyo.1992) and *Caton v. State*, 709 P.2d 1260, 1264–65 (Wyo.1985) (Wyoming Constitution). "The speedy trial clock starts to run upon arrest or when the complaint is filed." *Osborne v. State*, 806 P.2d 272, 277 (Wyo. 1991).

### (A) Length Of The Delay

[¶ 40] The appellant's jury trial began approximately 374 days following his arrest and 372 days following the filing of the charging information. The appellant argues that the length of the delay in the instant case is sufficient to trigger an analysis of the remaining speedy trial factors. The State essentially agrees with this proposition, as do we.

No precise length of delay determines a speedy trial violation, though we have held delays over 500 days to be presumptively prejudicial. *Harvey v. State*, 774 P.2d 87, 94 (Wyo.1989), *cert. denied*, [506 U.S. 1022,] 113 S.Ct. 661, 121 L.Ed.2d 586; *Phillips v. State*, 774 P.2d 118, 125 (Wyo. 1989). We have recognized delays similar in length to appellant's 355 and 319 days sufficient to warrant a speedy trial analysis. *Wehr*, 841 P.2d at 112 (320 and 238 days); *Osborne v. State*, 806 P.2d 272, 277 (Wyo.1991) (244 and 301 days).

*Springfield v. State*, 860 P.2d 435, 451 (Wyo. 1993). In *Almada v. State*, 994 P.2d 299, 304 (Wyo.1999), a case involving a 370–day delay between Almada's arrest and the acceptance of his plea, we found that the delay raised "speedy trial concerns and [was] sufficient to warrant further analysis." *See also Vargas v. State*, 963 P.2d 984, 992 (Wyo.1998), *cert. denied*, 540 U.S. 1082, 124 S.Ct. 944, 157 L.Ed.2d 758 (2003); *Wehr*, 841 P.2d at 112; and *Estrada v. State*, 611 P.2d 850, 853 (Wyo. 1980).

### (B) Reasons For The Delay

[¶ 41] The appellant argues that none of the delays in the instant case were his "fault." In particular, the appellant contends that he "advised his lawyer of the information regarding" the minivan and "urged his lawyer to take action," the prosecution chose to send the minivan out of state without consulting trial counsel, and the prosecution chose not to share "its own investigation into the van and the police cars" with trial counsel.

[¶ 42] The weight given to a particular delay "varies with its cause." *United States v. Tranakos*, 911 F.2d 1422, 1428 (10th Cir.1990).

"A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay."

*Wehr*, 841 P.2d at 112–13 (*quoting Barker v. Wingo*, 407 U.S. 514, 531, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)). Official bad faith in causing delay is weighed heavily against the government. *Barker*, 407 U.S. at 531, 92

S.Ct. 2182. "Delays attributable to the defendant are deducted from the equation." *Jennings v. State,* 4 P.3d 915, 921 (Wyo. 2000). "[W]e weigh any delay properly attributable to the defendant against the delay chargeable to the State. We have frequently acknowledged a defendant may defeat his claim to a speedy trial by his own dilatory practices." *Wehr,* 841 P.2d at 113.

[¶ 43] We find that the continuance of the January 30, 2002, trial date was attributable to the appellant. It appears from trial counsel's own statements that the motion for a continuance was styled as a "joint" motion with the prosecutor only to the extent that the prosecutor did not object to the continuance. Nothing in the record indicates that the prosecutor needed or desired the continuance, and the continuance was requested to specifically benefit the appellant. The appellant's expert witness, Mr. LaPier, was unavailable to testify during the January 30th trial setting and trial counsel seemingly anticipated the need for a continuance on this basis even prior to the discovery meeting in early January. It appears that the discovery meeting was held in early January, just weeks before trial, at trial counsel's request, and that the timing of that request contributed to any further delay for the unspecified discovery purposes.[11] While the motion states that the "parties" needed until March 15, 2002, to complete discovery, it would seem that whatever discovery remained following the discovery meeting was pursuant to additional, specific requests by trial counsel for the appellant's benefit. There is no indication that this additional discovery was necessary because the prosecution abused the discovery process in order to delay the trial or procure a tactical advantage. The appellant does not assert that the prosecution acted in bad faith, or even negligently, with respect to this discovery; indeed, the prosecution "maintained an open file policy" and trial counsel stated that the prosecution had complied with his discovery requests and he was satisfied with the discovery he had been provided.

[¶ 44] The continuance of the April 3, 2002, trial date was similarly attributable to the appellant. Again, while the motion for continuance was styled as a "joint" motion, the motion clearly was due to the unavailability of the appellant's expert witness to testify the first week of April. The motion stated that the appellant's expert witness was available to testify April 24–26, 2002, the motion specifically requested that the district court set the trial for those dates, and the district court reset the trial accordingly.

[¶ 45] The appellant stated in his pro se filings that trial counsel acted "on his own behalf" in requesting one or both of these continuances. However, the continuances were requested by trial counsel[12] to directly benefit the appellant due to the unavailability of the appellant's expert witness to testify regarding a defense theory the appellant himself had demanded, and apparently also to obtain additional discovery on the appellant's behalf. The expert witness did ultimately provide testimony favorable to the appellant at trial. While the circumstances may have been beyond the appellant's actual control to some degree, these delays should still weigh against the appellant in considering this speedy trial factor. *See, for example, United States v. Tanh Huu Lam,* 251 F.3d 852, 855–60, *amended by* 262 F.3d 1033 (9th Cir.), *cert. denied,* 534 U.S. 1013, 122 S.Ct. 503, 151 L.Ed.2d 413 (2001) and *Berry v. State,* 2004 WY 81, ¶ 34, 93 P.3d 222, 228–33 (Wyo.2004). The appellant does not meaningfully question the merits of these continuances on appeal, agrees that trial counsel was not ineffective in requesting the continuances, and in addressing this factor of the constitutional speedy trial analysis on appeal, the appellant does not argue with any particularity that these continuances should not be attributed to him.[13]

11. Trial counsel had filed a formal motion for discovery on October 31, 2001.

12. In referring to these two continuances, trial counsel stated that "the continuances that have already been requested have been at the request of the Defense...."

13. The appellant does briefly question in one paragraph of his appellate brief whether trial counsel could waive the appellant's right to a speedy trial despite the appellant's objection. To support his contention that the right to a speedy trial is solely the client's to waive, the appellant cites to *People v. Johnson,* 26 Cal.3d 557, 162

[¶ 46] We find that the continuance of the April 24, 2002, trial date was mostly attributable to the appellant. As early as October 2001, trial counsel had investigated the possibility that a police vehicle bumped the minivan during the pursuit and concluded that there was no evidence to support this theory. Trial counsel inexplicably did not examine the minivan, or request that another examine the minivan on the appellant's behalf, but on appeal the appellant does not allege that trial counsel was ineffective for failing to do so.[14]

[¶ 47] The minivan's potential significance clearly surfaced within the two weeks or so prior to the April 24, 2002, trial setting. When the appellant pointed out the scrape marks at issue to trial counsel, trial counsel demanded that the prosecution produce the minivan. The prosecution quickly located the minivan in Nebraska and, according to trial counsel, made it "available" to the defense. The record does not indicate how much delay was necessitated by the appellant's need to retain an expert for this purpose versus the minivan's location in Nebraska (as opposed to Evanston), but trial counsel stated that he could "readily obtain" an expert in Nebraska to examine the minivan and in the alternative, expressed a willingness to also "load the van back on a flat bed, [and] bring it back to Wyoming." He believed that either way, this could be accomplished with a minimum delay of sixty days.

[¶ 48] The minivan had apparently been released from the prosecution's possession in the fall of 2001. While the appellant's trial

---

Cal.Rptr. 431, 606 P.2d 738 (1980) and quotes from *People v. Anderson*, 25 Cal.4th 543, 106 Cal.Rptr.2d 575, 22 P.3d 347 (2001), *cert. denied*, 534 U.S. 1136, 122 S.Ct. 1082, 151 L.Ed.2d 982 (2002).

*Johnson* does not help the appellant at all in the instant case because counsel in *Johnson* sought trial continuances based on his scheduling conflicts with other cases and the issue concerned "the decision of the public defender and the court to resolve these conflicts by trying other cases in advance of that of defendant." *Johnson*, 162 Cal.Rptr. 431, 606 P.2d at 743. In *Johnson*, counsel did not seek "additional time to prepare the defense or to secure attendance of witnesses," counsel was not " 'pursuing his client's best interest in a competent manner,' " there was "no reason to believe delay would benefit defendant," and it was not a matter of "defense strategy." *Id.* at 744–45 (*quoting Townsend v. Superior Court*, 15 Cal.3d 774, 126 Cal. Rptr. 251, 543 P.2d 619, 626 (1975)). *Johnson* also involved the waiver of a state statutory right to a speedy trial, and Johnson did not contend that the delay violated his federal constitutional right to a speedy trial. *Id.* at 744 n. 6.

Interestingly, three statements in *Anderson* also appear to contradict the appellant's assertion as it applies to the instant case: (1) "Though neither this court nor the United States Supreme Court has decided the precise issue, it would appear, in any event, that defendant's express personal on-the-record agreement to all but one of the continuances constituted absolute waivers, to that extent, of his speedy trial rights under the federal Constitution"; (2) While the appellant in the instant case quotes the following passage from *Anderson* in his appellate brief, "We have never decided whether or how the fundamental state constitutional right ... can be waived, except to suggest in dictum that counsel cannot waive it over his client's objection for *counsel's own convenience*," the court in *Anderson* actual-ly continued by stating that "[b]ut for reasons set forth in the preceding footnote, we readily conclude that the defendant's express personal agreement to trial continuances sought *for his benefit* constituted such a waiver"; and (3) the delays in *Anderson* were "for defendant's benefit, not the result of prosecutorial negligence or bad faith." *Anderson*, 106 Cal.Rptr.2d 575, 22 P.3d at 388 and n. 21 and 389 n. 22 (emphasis added). Aside from these two cases, the appellant does not cite any additional legal authority.

In the instant case, the appellant's brief discussion of the issue occurs in the context of his W.R.Cr.P. 48(b) argument and the continuance of the April 24, 2002, trial setting. That continuance was not granted despite an objection by the appellant; the appellant clearly stated on the record that he did not object to the continuance and he has not presented cogent appellate argument that he was "coerced" during the April 23, 2002, hearing. The appellant does not renew the argument with any particularity in the context of his constitutional analysis and whether the January 30, and April 3, continuances should be attributable to him, and in fact, appellate counsel stated at oral argument that she believed trial counsel had "strategic authority" to properly request trial continuances within the 180-day period even if the appellant had objected. Finally, the continuances of the January 30, April 3, and April 24, trial dates were sought directly for the appellant's benefit. The authority cited by the appellant would therefore appear to compel a result contrary to the position he espouses on appeal. Under the circumstances, we need not comment further on this issue.

14. As trial counsel noted, the scrape marks depicted in the crime scene photographs of the minivan were "not consistent with what I, as a lay person, believe would be consistent with a vehicle being bumped in the right, quarter panel."

counsel stated in an affidavit that this occurred without consulting him, Trooper Lewis testified that it was his understanding that trial counsel approved the minivan's release. We have not been directed to any findings by the district court on the issue, and the conflict is not clearly resolved by resorting to the record. On appeal, the parties simply advocate the version that favors their respective positions.

[¶ 49] We conclude that this delay is mostly attributable to the appellant for several reasons: (1) the timing of the appellant's request to produce the minivan in relation to the April 24, 2002, trial setting; (2) according to the motion for continuance, the delay was "essential to the defense of the case" so that an expert could examine the minivan on behalf of the appellant; (3) the delay was requested by trial counsel and the appellant stated on the record that he did not object to a delay for this purpose (a purpose the appellant himself espoused); (4) the appellant does not argue that the prosecution acted in bad faith in releasing the minivan from its possession; (5) the record is not necessarily clear in light of the disputed facts that the prosecution acted negligently in releasing the minivan from its possession; and (6) the appellant points to no evidence, despite his expert's examination of the minivan, that the minivan's condition (as opposed to its location) contributed to the delay.

[¶ 50] The record does not support the appellant's contention that an alleged failure by the Evanston police department to disclose its investigation of a rumor that a police vehicle bumped the appellant off the road during the pursuit contributed to the need for this delay. Trial counsel spoke with Chief Harvey and Lieutenant Allmaras about this investigation, their observations as to the lack of physical damage to the police vehicles present during the pursuit, and the photographs of the police vehicles, prior to the April 23, 2002, hearing. The appellant has not established how the timing of this disclosure impacted his ability to prepare for an April 24, 2002, trial or otherwise necessitated a delay in that trial setting.

[¶ 51] The continuance of the July 17, 2002, trial setting was clearly attributable to the appellant. Trial counsel, with the appellant's "total agreement," requested the delay because a "vital" defense witness was unavailable to testify that week. Rather than take the witness' trial deposition, the defense insisted on the witness testifying in person as part of its trial strategy. Trial counsel specifically requested an October 2002 trial date to accommodate its expert witness' (Mr. La-Pier) schedule. Although again, the formal motion for continuance was styled as a "joint" motion, which appears to have been true only to the extent that the prosecution did not object to the continuance and the continuance was sought for the appellant's benefit. In discussing this issue on appeal, the appellant does not argue with any particularity that this delay should not be attributed to him.

### (C) Assertion of Right

[¶ 52] The appellant claims that he "unequivocally demanded a speedy trial, and his later, coerced oral statements cannot be held as a voluntary, knowing waiver of that right." The appellant does not cogently argue the voluntariness issue in discussing this factor.

> We have held it is not necessary for a defendant to assert his right to a speedy trial in order to identify a speedy trial violation. *Osborne.* However, we can, and do, consider whether the right was asserted, and how vigorously, in determining the reasonableness of any delay. *Osborne.* The action or inaction of the defendant in this regard is a reflection of the actual amount of prejudice being experienced. *Barker.* We recognize pretrial delay may be either prejudicial or beneficial to a defendant. *See Barker.*

*Wehr,* 841 P.2d at 113. The appellant did state in his four February, March, and April 2001, pro se filings that he had not waived his right to a speedy trial, "I want my right to a speedy trial," "do not consent freely to this waiver," and "request my right to a speedy trial." However, we note that the appellant also later stated on the record that he did not object to continuing the April 24, 2002, trial setting and agreed on the record to continue the July 17, 2002, trial setting.

**(D) Prejudice**

[¶ 53]   In addressing this factor, the appellant mostly relies on the prejudice he claims is inherent in the length of the delay, simply stating that "while there was definitely prejudice, the extent of the prejudice is unknown." In an attempt to identify specific prejudice, the appellant asserts that the minivan was "in the custody of some salvage yard, subject to unknown intrusions and alterations throughout the time period of the delay" and merely declares that he suffered unspecified "excessive pretrial anxiety throughout the period of the delay."

[¶ 54]   Prejudice is a key element to be considered in balancing these factors, but is not absolutely required to demonstrate a speedy trial violation. *Springfield,* 860 P.2d at 451; *Wehr,* 841 P.2d at 114; *Osborne,* 806 P.2d at 278. Prejudice may consist of: (1) lengthy pretrial incarceration; (2) pretrial anxiety; or (3) impairment of the defense. *Osborne,* 806 P.2d at 278. Of these factors, the possibility that a defendant's defense will be impaired is the "most serious" factor "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Barker,* 407 U.S. at 532, 92 S.Ct. 2182. Pretrial anxiety "is the least significant" factor and because a "certain amount of pretrial anxiety naturally exists," the appellant must demonstrate that he suffered "extraordinary or unusual" pretrial anxiety. *Campbell v. State,* 999 P.2d 649, 656 (Wyo.2000); *Wehr,* 841 P.2d at 114.

[¶ 55]   We do not find that the length of the delay in the instant case exceeded a point where there was a probability of substantial prejudice, particularly where the delay was mostly attributable to the appellant and sought exclusively for the appellant's benefit. *See Tanh Huu Lam,* 251 F.3d at 859–60 (where defendant responsible for the delay, "he bears the burden of demonstrating actual prejudice").

We held in *Caton* that "until delay exceeds a point where there is a 'probability of substantial prejudice,' the burden of proving prejudice should remain with the accused." *Caton,* 709 P.2d at 1266. In *Harvey [v. State,* 774 P.2d 87 (Wyo.1989) ] and

*Phillips [v. State,* 774 P.2d 118 (Wyo. 1989) ], we concluded an eighteen-month delay was excessive and gave rise to a probability of substantial prejudice warranting a presumption of prejudice. *Harvey; Phillips.* We have not, however, ruled a delay like that occasioned in this case—ten and one-half months-gives vitality to a presumption of prejudice. *Osborne,* 806 P.2d 272; *Binger v. State,* 712 P.2d 349 (Wyo.1986); *Estrada,* 611 P.2d 850.

*Wehr,* 841 P.2d at 114; *see also Osborne,* 806 P.2d at 278 and *Doggett v. United States,* 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992).

[¶ 56]   The appellant has not demonstrated actual prejudice in the instant case. The appellant does not even refer to pretrial incarceration in addressing this factor in his appellate brief, and does not refer to any specific facts to support the assertion that he suffered unspecified excessive pretrial anxiety. *See Sides v. State,* 963 P.2d 227, 230 (Wyo.1998) (appellant did not define or address with any particularity the "pretrial anxiety" he allegedly suffered). Nor can the appellant establish any actual impairment to the defense of his case. Three of the trial continuances were sought either exclusively, or primarily, due to the unavailability of the appellant's trial witnesses, and one continuance was sought in order to allow an expert witness to examine potentially exculpatory evidence (which did in fact occur prior to trial). The appellant has not directed us to any evidence indicating that the minivan's condition was actually altered or somehow prevented him, or his expert, from examining or testing the minivan in anticipation of trial. *See generally also Jennings,* 4 P.3d at 922; *Campbell,* 999 P.2d at 656; *Almada,* 994 P.2d at 305 (370–day delay and "burden is on the petitioner to show prejudice"); *Sides,* 963 P.2d at 230; *Roderick v. State,* 858 P.2d 538, 542–43 (Wyo.1993); and *Cosco v. State,* 503 P.2d 1403, 1406 (Wyo.1972), *cert. denied,* 411 U.S. 971, 93 S.Ct. 2164, 36 L.Ed.2d 693 (1973) (nineteen-month delay mostly for the benefit of or caused by the defendant and defendant not prejudiced).

[¶ 57]   In balancing all of these factors, we conclude that the reasons for the delay and

the lack of actual prejudice to the appellant weigh heavily against the appellant, and are clearly not outweighed by the remaining factors. Accordingly, the appellant was not denied his constitutional right to a speedy trial in the instant case.

## BRADY VIOLATION

[¶ 58] The appellant claims that the prosecution violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) because: (1) an Evanston police department investigation of rumors that a police department vehicle struck the minivan during the pursuit "was not discussed with defense counsel or even the investigating authority, the state highway patrol"; and (2) the minivan was released from the prosecution's custody without the appellant's knowledge or permission. In discussing this issue, we will necessarily reiterate some of the facts previously set forth in this opinion.

In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court set forth the basic principle that the prosecution violates due process by suppressing favorable evidence that is material either to the guilt or to the punishment of the accused, "irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–97. . . . The duty to disclose . . . exculpatory evidence applies even though there has been no request by the accused.[15] . . . "Moreover, the rule encompasses evidence 'known only to police investigators and not to the prosecutor.' In order to comply with *Brady*, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.' " *Strickler* [*v. Greene*, 527 U.S. 263, 280–81, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999) ] . . . .

. . .

We must determine, therefore, whether the government's failure to disclose evidence favorable to the defendant deprived the defendant of a fair trial under *Brady*

by considering whether the "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." . . . In order to establish a *Brady* violation, a defendant must demonstrate that the prosecution suppressed evidence, the evidence was favorable to the defendant, and the evidence was material. *Helm v. State*, 1 P.3d 635, 639 (Wyo.2000). We have previously decided that the materiality of withheld evidence and its possible effect on the outcome of the trial are mixed questions of fact and law. *Id.* . . . [A] claim of failure to disclose evidence in violation of *Brady* is properly reviewed de novo.

*Davis v. State*, 2002 WY 88, ¶¶ 14–16, 47 P.3d 981, 985–86 (Wyo.2002). Favorable evidence is material if " 'its suppression undermines confidence in the outcome of the trial.' " *Id.*, 2002 WY 88, ¶ 19, 47 P.3d at 987 (*quoting United States v. Bagley*, 473 U.S. 667, 680–81, 105 S.Ct. 3375, 3382–83, 87 L.Ed.2d 481 (1985)). The delayed disclosure of *Brady* materials, " 'alone[,] is not always grounds for reversal. As long as ultimate disclosure is made before it is too late for the defendant[ ] to make use of any benefits of the evidence, Due Process is satisfied.' " *United States v. Scarborough*, 128 F.3d 1373, 1376 (10th Cir.1997) (*quoting United States v. Warhop*, 732 F.2d 775, 777 (10th Cir.1984)). *See also Young v. State*, 849 P.2d 754, 765 (Wyo.1993). Similarly, *Brady* " 'is not violated when the Brady material is available to [a defendant] during trial.' " *United States v. Vap*, 852 F.2d 1249, 1256 (10th Cir.1988) (*quoting United States v. Behrens*, 689 F.2d 154, 158 (10th Cir.), *cert. denied*, 459 U.S. 1088, 103 S.Ct. 573, 74 L.Ed.2d 934 (1982)).

[¶ 59] It appears that

"[t]he Supreme Court's jurisprudence divides cases involving nondisclosure of evidence into two distinct universes. *Brady* and its progeny address exculpatory evidence still in the government's possession. [*Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) ] and [*California v. Trombetta*, 467 U.S. 479, 104

---

15. On October 31, 2001, the appellant did file a motion seeking an order "permitting Defendant's counsel to inspect and copy any exculpatory material or statements required to be furnished pursuant to the findings in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)."

S.Ct. 2528, 81 L.Ed.2d 413 (1984) ] govern cases in which the government no longer possesses the disputed evidence." *Fero v. Kerby,* 39 F.3d 1462, 1472 (10th Cir.1994) (quoting *United States v. Femia,* 9 F.3d 990, 993 (1st Cir.1993)).

*United States v. Gomez,* 191 F.3d 1214, 1218 (10th Cir.1999). Further, the

principles articulated in *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), and *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), regarding the Due Process Clause and the government's destruction or loss of evidence prior to a criminal trial guide our analysis. Under the two-prong *Trombetta* test, the government violates a defendant's right to due process when: (1) it destroys evidence whose exculpatory significance is "apparent before" destruction; and (2) the defendant remains unable to "obtain comparable evidence by other reasonably available means." *Trombetta,* 467 U.S. at 489, 104 S.Ct. at 2534. The Court in *Youngblood* extended *Trombetta* to provide that, if the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was "potentially useful" for the defense, then a defendant must show that the government acted in bad faith in destroying the evidence. *Youngblood,* 488 U.S. at 58, 109 S.Ct. at 337–38.

... The ... "mere fact that the government controlled the evidence and failed to preserve it is by itself insufficient to establish bad faith." [*United States v.*] *Richard,* 969 F.2d [849] at 853–54 [ (10th Cir. 1992) ]....

... To invoke *Trombetta,* a defendant must demonstrate that the government destroyed evidence possessing an "apparent" exculpatory value. *Trombetta,* 467 U.S. at 489, 104 S.Ct. at 2534. However, to trigger the *Youngblood* test, all that need be shown is that the government destroyed "potentially useful evidence." *Youngblood,* 488 U.S. at 58, 109 S.Ct. at 337. The Court in *Youngblood* defined "potentially

useful evidence" as evidence of which "no more can be said than that it could have been subjected to tests, the results of which *might* have exonerated the defendant." *Id.* at 57, 109 S.Ct. at 337 (emphasis added)....

. . .

... Our inquiry into bad faith "must necessarily turn on the [government's] knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood,* 488 U.S. at 57 n. *, 109 S.Ct. at 336 n. *.

. . .

... Of course, mere negligence on the government's part in failing to preserve such evidence is inadequate for a showing of bad faith. *Youngblood,* 488 U.S. at 58, 109 S.Ct. at 337–38[.]

*United States v. Bohl,* 25 F.3d 904, 909–12 (10th Cir.1994) (footnote omitted). *See also Young,* 849 P.2d at 763–65; *Gale v. State,* 792 P.2d 570, 587–88 (Wyo.1990); *Wilde v. State,* 706 P.2d 251, 255 (Wyo.1985); and *Wheeler v. State,* 691 P.2d 599, 602–03 (Wyo.1984).

**Evanston Police Department Investigation**

[¶ 60] About a week after the incident, Chief Harvey testified that he received an email from the mayor regarding a rumor that the officers who pursued the appellant on September 29, 2001, "forced him off the road." Chief Harvey did not know the particular source of the rumor; it appears that a rumor to that effect was widespread in the community, but not attributable to a particular source or an identifiable evidentiary basis.[16]

[¶ 61] Upon learning of the rumor, Chief Harvey and Lieutenant Allmaras examined the "front, the rear, the back, the sides, [and] the exterior" of Officer Vranish's patrol vehicle, and did not observe any physical damage to the vehicle. Lieutenant Allmaras then had another Evanston police officer photograph all of the patrol vehicles that were present during the pursuit, and according to Lieutenant Allmaras, no physical damage to

---

**16.** Trooper Lewis had heard the rumor within days after the incident, and the appellant's trial counsel was aware of the rumor possibly even

before he "was assigned the case." According to Chief Harvey, the police department was "often" rumored to have done "things."

the patrol vehicles was evident in the photographs. Neither Chief Harvey, nor Lieutenant Allmaras, made a written report of this investigation or informed the Wyoming Highway Patrol of their observations at the time. According to Lieutenant Allmaras, the officer who photographed the patrol vehicles did produce a written report "about taking the photos of the vehicles . . . ."

[¶ 62] During an April 2002 court hearing, trial counsel stated that even before he was "assigned the case" (and certainly before the October 11, 2001, preliminary hearing), he "heard rumors in the general community and one of the rumors was that the police officers had actually bumped . . . the [appellant's] vehicle and had bumped the vehicle off the road, causing it to run into the pedestrian." Recognizing "the seriousness of the allegations" and "the seriousness of the rumor," trial counsel developed a preliminary defense theory that the police "bumped" the appellant's vehicle during the pursuit, and contacted an investigator.

[¶ 63] The investigator went to the crime scene, obtained and examined the police reports, interviewed people who worked in the area, and according to trial counsel, even talked to "the police," who told the investigator

> that they were inspecting their vehicles and they were taking photos and those photos could be made available to him. Honestly, I don't know if [the investigator] told me that or not, that there were—I believe he told me that he had talked with the police and there was no damage to the vehicles. I don't know if he transmitted to me the idea that there were actual photos of the police vehicles."

At that time, the investigator determined that there was "simply no evidence of any kind of contact between the police vehicle and the [appellant's] vehicle" and trial counsel concluded that there was not "a scintilla of evidence to suggest that the police officer's vehicle had come into contact" with the minivan and "dropped that defense strategy" in October or November of 2001.

[¶ 64] By April 2002, trial counsel personally contacted the police department and it appears that he talked to both Lieutenant

Allmaras and Chief Harvey. They told trial counsel that the patrol vehicles had been examined and photographed, " 'there was no sign of damage, no sign of collision,' " a written report had not been prepared, the photographs apparently remained "unprocessed," and they assured trial counsel that "they would get them processed and they would provide me photos of the police vehicles." Lieutenant Allmaras did prepare a written report regarding these matters in April 2002, to which report trial counsel referred during a later court hearing. Trial counsel even stated in April 2002 that he didn't "see this giant conspiracy to hide evidence from" the appellant.

[¶ 65] By June 2002, trial counsel stated that at trial he intended to use evidence of the police department's awareness of the rumor and the department's investigation of its own patrol vehicles (rather than referring the matter to the highway patrol) in "establishing in the minds of the jury the issue that there could have been a bump and there could have been a police cover up . . . ." Trial counsel emphasized it was essential that Chief Harvey and Lieutenant Allmaras testify in person at trial so that he could question them regarding why "they are investigating themselves" and create an impression that they " 'were covering up something' " or were " 'too dumb to bring in the Highway Patrol' or whatever the jury might conclude from that act." At trial, the appellant ultimately called Chief Harvey and Lieutenant Allmaras as witnesses during the appellant's case and questioned them about these matters. Trial counsel also cross-examined Trooper Lewis and Trooper Lankford in this regard and referred to the rumors during closing argument in attacking Trooper Lewis' investigation of the incident.

[¶ 66] The appellant seems to suggest, albeit with virtually no analysis, that the alleged failure to discuss or disclose the rumor and resulting Evanston police department investigation to defense counsel or Trooper Lewis constituted a *Brady* violation. The appellant does not cite specifically to any portion of the record to support his contention that this information was not discussed with, or disclosed to, trial counsel. In fact,

the record reveals that trial counsel had actual knowledge of rumors to this effect shortly after September 29, 2001, and had the rumors investigated at that time. Trial counsel later personally talked to Lieutenant Allmaras and Chief Harvey about the particular rumor the mayor conveyed to Chief Harvey, and the existence and results of the police department's subsequent investigation. Accordingly, the appellant has not established that the prosecution suppressed or failed to disclose any of this information. The appellant had actual knowledge of all of the information well in advance of trial [17] and clearly made use of the benefits of the information at trial. We further note that the results of the police department's investigation were not exculpatory because the officers' observations, and the photographs, of the patrol vehicles within days of the pursuit did not reveal any physical damage to the patrol vehicles.

### The Minivan

[¶ 67] The appellant also contends that the prosecution "failed to preserve" the minivan because the prosecution released the minivan from its possession without "the permission or knowledge of [the appellant] or his counsel...." [18] According to the appellant, the minivan "had obviously been through the hands of many people" by the time it was located at a Nebraska salvage yard in April 2002, and was "subjected to unknown alterations or conditions" in the interim. Because the existing crime scene photographs of the minivan could not "give information such as depth, length, type or cause of the scrapes" visible in the photographs, the minivan, "in an unaltered state,

was absolutely critical evidence." The appellant concludes that the minivan was therefore "potentially exculpatory" material evidence because "if there was any indication whatsoever that the scraping marks came from a police vehicle, then the evidence was material" to the appellant's "guilt."

[¶ 68] According to Trooper Lewis, the minivan was impounded, taken to a towing company "and secured inside the vehicle storage there," and later moved to the state department of transportation "shop and put into storage there." Trooper Lankford testified that he and Trooper Lewis examined, measured, and photographed the minivan while it was at the department of transportation shop. It was trial counsel's understanding that the minivan, which minivan apparently belonged to Bobbie Decker, was subsequently released to an insurance company and in February 2002, "an outfit out of Casper" auctioned the minivan to a Nebraska salvage yard.

[¶ 69] There is a conflict in the record regarding the circumstances of the minivan's release from the prosecution's possession. Trial counsel stated in an affidavit attached to an April 2002 motion to continue the trial that the prosecution released the minivan "without consulting defense counsel." Trooper Lewis testified at trial that a prior prosecutor in the case [19] "apparently, got with [the appellant's trial counsel] and we got the information from him that it was okay for us to release the vehicle." In late October or November 2001, according to Trooper Lewis, the prosecutor talked with trial counsel, who said that "there was nothing he wanted to do with the van. He didn't want to have any-

---

**17.** *See United States v. Zagari*, 111 F.3d 307, 320 (2nd Cir.), *cert. denied*, 522 U.S. 988, 118 S.Ct. 455, 139 L.Ed.2d 390 (1997), *cert. denied*, 526 U.S. 1103, 119 S.Ct. 1585, 143 L.Ed.2d 679 (1999) (*"Brady* cannot be violated if the defendant[] had actual knowledge of the relevant information"") and *Relish v. State*, 860 P.2d 455, 459 (Wyo.1993).

**18.** The appellant's argument on appeal is based on the prosecution releasing the minivan from its possession and not the alleged suppression or nondisclosure of the minivan. In fact, when the appellant demanded that the prosecution produce the minivan in April 2002, the prosecution located the minivan and made it "available" to

the appellant prior to trial. As appellate counsel acknowledged at oral argument, this issue is "more a question of preservation of evidence which was potentially exculpatory."

**19.** The prosecutor who originally filed the charges apparently left between the April 23, 2002, court hearing and a June 19, 2002, court hearing. A different prosecutor appeared at the June 19 court hearing, and yet a different prosecutor appeared at the August 28, 2002, pretrial conference. The prosecutor who appeared at the pretrial conference, and his co-counsel, tried the case to the jury.

body look over it or anything and it was okay to release the van." Trial counsel did not object or challenge this testimony at trial, although his co-counsel elicited the testimony while cross-examining Trooper Lewis.

[¶ 70] As we previously stated, the appellant's trial counsel became aware in early October 2001 of the rumor that law enforcement had forced the appellant off the road or "bumped" the minivan during the pursuit, and had the rumor investigated. The investigator did not inspect the minivan himself at that time, nor did trial counsel. Nevertheless, the investigator determined that there was "simply no evidence of any kind of contact between the police vehicle and the [appellant's] vehicle" and trial counsel concluded that there was not "a scintilla of evidence to suggest that the police officer's vehicle had come into contact" with the minivan and "dropped that defense strategy" in October or November of 2001.

[¶ 71] Although trial counsel had previously received the prosecution's crime scene photographs of the minivan, he did not notice the "scrape marks" depicted on the minivan's right rear quarter panel until the appellant pointed them out a "couple weeks" prior to the April 23, 2002, court hearing. After the appellant pointed out these "scrape marks" in the photographs of the minivan, trial counsel demanded in writing that the prosecution produce the minivan. The prosecutor's office "did the foot work" and located the minivan at the salvage yard in Nebraska. Trial counsel stated to the district court at that time that the minivan "has been produced" and it "is available for us." He further characterized the circumstances in April 2002 as follows:

> We're ready, willing and able to go to Ainsworth, Nebraska, if we have to, load the van back on a flat bed, bring it back to Wyoming. I presume Cheyenne—and maybe I'm speaking out of turn here for the Public Defender's Office. Of course, this would all be at the expense of the Public Defender's Office. But, in essence, have someone look at not only those

scrapes but look at the van for any other indications that it had been bumped[.] Quite frankly, I haven't done it before because there hadn't been a scintilla of evidence to suggest that, your Honor.

Trial counsel stated that he would call the salvage yard that day "and put a hold on the thing." Co-counsel for the appellant indicated at an August 2002 pretrial conference that the defense "did locate the vehicle. It was in a junk yard. It had been moved to Nebraska. And I'm not exactly sure if there was some alteration, but an expert did look at it."

[¶ 72] Notwithstanding the conflicting information regarding the minivan's release from the prosecution's possession, the appellant has presented no evidence that the prosecution failed to preserve the minivan.[20] The appellant does not contend on appeal that the minivan was lost, destroyed, or contaminated by the prosecution, and his statement that the minivan was "subjected to unknown alterations or conditions" following its release from the prosecution's possession is purely speculative. Indeed, when the minivan was located in Nebraska in April 2002, the salvage yard sent a "current, digital photograph" of the minivan to the prosecutor, who shared the photograph with trial counsel. The digital photograph depicted the minivan's "right, rear, quarter panel, ... clearly showing the strafe marks." Trial counsel noted "[i]t's the very same vehicle," "it's still usable for parts," and the "vehicle was sitting there to be parted out, not to be smashed." The appellant presents no evidence that the minivan's condition in April 2002 prevented him, or his expert, from examining, photographing, or testing the "scrape marks" at issue. *See Wheeler*, 691 P.2d at 602–03 and *United States v. Wolf*, 839 F.2d 1387, 1391–92 (10th Cir.), *cert. denied*, 488 U.S. 923, 109 S.Ct. 304, 102 L.Ed.2d 323 (1988) ("[i]f the means of obtaining the exculpatory evidence has been provided to the defense, however, a Brady claim fails, even if the prosecution does not physically deliver the evidence requested").

20. It does not appear that the prosecution ever intended to offer the minivan as a trial exhibit, so chain of custody was not a concern.

[¶ 73] The appellant has also failed to establish that the minivan's exculpatory value was sufficiently apparent at the time the prosecution released the minivan from its possession.[21] On appeal, the appellant characterizes the minivan as "potentially exculpatory" evidence and states that "if" the scrape marks at issue indicated that they were caused by a police vehicle, the minivan would have been material evidence. The appellant also contends that the prosecution knew that the minivan was "potentially" exculpatory because the police department investigated the rumor that a police vehicle forced the appellant off the road. However, when evidence is "potentially" useful or exculpatory,[22] as even the appellant has characterized the minivan, the appellant must also demonstrate that the prosecution acted in bad faith in allegedly failing to preserve the evidence. The appellant does not argue that the prosecution acted in bad faith in releasing the minivan from its possession.

[¶ 74] The appellant has similarly failed to establish that the minivan's condition impaired his ability to advance his theories at trial. The appellant clearly had access to the minivan itself well in advance of trial (the district court having granted the appellant a trial continuance in April 2002 to examine the minivan), an expert had examined the minivan in Nebraska on the appellant's behalf, and the appellant had crime scene photographs of the minivan depicting the scrape marks at issue.[23] At trial, the appellant's counsel chose to use the crime scene photographs of the minivan's right and left rear quarter panels extensively to cross-examine

Trooper Lewis and Trooper Lankford regarding the scrape marks, and also referred to the scrape marks during closing argument in attacking Trooper Lewis' investigation and arguing that Officer Vranish forced the minivan off the road. The record does not reveal why the appellant's trial counsel chose to rely on the crime scene photographs at trial rather than the minivan itself, or the expert that examined the minivan, but the reason was not, based on the record before us, due to a lack of information or opportunity to examine, photograph, or test the minivan. *See Vap,* 852 F.2d at 1256; *Young,* 849 P.2d at 765; *Gale,* 792 P.2d at 588; and *Warhop,* 732 F.2d at 776–77.

### PHOTOGRAPH OF VICTIM AT SCENE

[¶ 75] The appellant argues that the district court erred in admitting into evidence State's Exhibit 5 (the photograph), a photograph of the deceased victim at the crime scene. The appellant did not object to the photograph's admission into evidence at trial. On appeal, it is therefore incumbent upon the appellant to demonstrate plain error in that "the record clearly shows an error that transgressed a clear and unequivocal rule of law which adversely affected a substantial right." *Compton v. State,* 931 P.2d 936, 939 (Wyo.1997).

[¶ 76] The record clearly reflects what occurred at trial regarding the photograph's admission into evidence. Officer Brackin testified that he arrived at the crime scene almost immediately after the minivan came to rest, and as the appellant was fleeing the

---

21. We note that the appellant's own trial counsel even characterized the scrape marks he observed in the crime scene photographs as "[in]consistent with what I, as a lay person, believe would be consistent with a vehicle being bumped in the right, quarter panel." At trial, Trooper Lewis described the marks on left rear as "pretty insignificant" "minor scratching" down the side and the right rear as "some scratch marks along the side that extends from nearly the bottom of the bumper all the way up, along the side, along the plastic molding, up to nearly the top of the tire." He discovered "some sand and some small rocks consistent with a concrete type thing imbedded in the plastic" of the right rear scrape marks, and did not observe any paint transfers in that area of the minivan. Trooper Lewis testified that he was not able to "find anything at the crash

scene ... that had impacted the van in this manner," and the minivan looked as if "the vehicle had run alongside, maybe, a concrete Jersey barrier or something of that nature."

22. The United States Supreme Court has characterized "potentially" exculpatory or useful evidence as "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Arizona v. Youngblood,* 488 U.S. 51, 57, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).

23. Trial counsel noted that he had been provided approximately two hundred "photographs taken by various agents of the State of Wyoming...."

scene. Officer Brackin then described the minivan's location, and its extensive physical damage. State's Exhibit 4, a photograph of the minivan's front end, was admitted into evidence without objection. The vehicle's condition, including the physical damage described by Officer Brackin, is evident in Exhibit 4. The following colloquy then ensued:

[PROSECUTOR]: Officer Brackin, did you notice any passengers in that minivan at the time you first walked up?

A. Yes, sir, I did.[24]

Q. What position was that passenger in?

A. As I walked to the front of the vehicle, I looked through the—the hole in the front windshield and I saw that there was a male that was in the van in a position where his face—the right side of his face and head was laying in the passenger seat. His body was—essentially looked to be suspended in the air, with his pant leg or legs, ankle, caught on the broken glass.

Q. Did you observe any obvious injuries to the passenger in the van?

A. I did. When I looked at him, of course, his—his body was somewhat in an unnatural state. His head and neck were bent further than what is normally allowed. I also noticed that he was missing, about mid calf, his foot. There was an obvious, of course, fracture of the lower leg. And there was muscle tissue hanging from the bottom of the pant leg.

Q. Did you check to see if this person was alive?

A. I saw that from the obvious injury of the lower portion of the leg, there was actually no blood flow, either venous or arterial blood flow. There was some blood in the seat where his face was on the seat, but not too—not a large amount. I checked. There was no pulse.

. . .

Q. Officer Brackin, I'm handing you what I have marked as State's Exhibit 5 for identification. Can you tell me what that is?

A. That is the person that I saw when I looked in the van, in the position in which I found him. I later identified him as—as Mr. Donald Walker.

Q. How are you able to identify that person?

A. He—I saw that he had a wallet in his back pocket. I removed the wallet. Went through the wallet. Found a driver's license with his name.

. . .

[PROSECUTOR]: Your Honor, I would offer State's Exhibit 5 for—

[APPELLANT'S COUNSEL]: No objection, your Honor.

[¶ 77] Trial court rulings on the admissibility of evidence are subject to our well-known review standard:

Such decisions are within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion. *Story v. State*, 2001 WY 3, ¶ 9, 15 P.3d 1066, 1068 (Wyo.2001); *Blumhagen v. State*, 11 P.3d 889, 892 (Wyo.2000). Determining whether the trial court abused its discretion involves the consideration of whether the court could reasonably conclude as it did, and whether it acted in an arbitrary or capricious manner. *Trujillo v. State*, 2 P.3d 567, 571 (Wyo.2000) (*quoting Solis v. State*, 981 P.2d 34, 36 (Wyo. 1999)).

A trial court's evidentiary rulings " 'are entitled to considerable deference,' " and will not be reversed on appeal so long as " 'there exists a legitimate basis for the trial court's ruling....' " *Robinson v. State*, 11 P.3d 361, 367 (Wyo.2000), *cert. denied*, 532 U.S. 980, 121 S.Ct. 1620, 149 L.Ed.2d 483 (2001) (*quoting Simmers v. State*, 943 P.2d 1189, 1197 (Wyo.1997)). The appellant bears the burden of proving an abuse of discretion.

*Lancaster v. State*, 2002 WY 45, ¶¶ 11–12, 43 P.3d 80, 87 (Wyo.2002).

[21, 22] [¶ 78] Generally, photographs are

---

**24.** Of course, the officer later determined that the victim was a pedestrian, not a passenger in the vehicle.

admissible if they correctly portray the subject matter, do not convey a false impression, and if their probative value is such as to outweigh the possibility of undue prejudice from such circumstances as their gruesome character. *Reeder v. State,* 515 P.2d 969, 973 (Wyo.1973). Reversal is required for the admission of a photograph only if the photograph has little or no probative value and is extremely inflammatory or introduced merely to inflame the jury. *Shaffer v. State,* 640 P.2d 88, 97, 31 A.L.R.4th 166 (Wyo.1982).

*Phillips v. State,* 835 P.2d 1062, 1071 (Wyo. 1992).[25] Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." W.R.E. 401. "Evidence which is not relevant is not admissible." W.R.E. 402. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." W.R.E. 403.

[¶ 79] The appellant first contends that the photograph was "not probative of any fact in dispute." We find that the photograph was probative of the victim's identity, the fact of the victim's death (including the condition in which Officer Brackin found the victim upon arriving at the scene), and the jury's understanding of the cause of the victim's death (to the extent it coincided with several witnesses' specific testimony regarding the crime scene and what occurred between the point the minivan left the road and ultimately came to rest). In this respect, we note the following: (1) In "every homicide case the state must establish the identity of the person killed" and Officer Brackin used the photograph at trial in identifying the deceased victim. *Wilks v. State,* 2002 WY 100, ¶ 13, 49 P.3d 975, 983 (Wyo. 2002); (2) The State was also required to

prove that the appellant operated a vehicle "in violation of [Wyo. Stat. Ann. § 31–5–233 (driving while under the influence) ]," caused the "death of another person," and that "the violation [of Wyo. Stat. Ann § 31–5–233 was] the proximate cause of the [victim's] death." Wyo. Stat. Ann. § 6–2–106(b); (3) Generally, photographs " 'are properly received into evidence to enable the jury as the trier of facts to better understand that which the photo represents.'" *Mayer v. State,* 618 P.2d 127, 130 (Wyo.1980) (*quoting Reeder v. State,* 515 P.2d 969, 972 (Wyo.1973)); *see also Barnes v. State,* 858 P.2d 522, 528 (Wyo. 1993); and (4) Generally, it " 'is well-established that photographs may be used to graphically portray, among other things, the scene of a crime, the identification of a victim, the appearance and condition of the deceased, and the location, nature and extent of the wounds or injuries, all of which matters are relevant.'" *People v. Dunlap,* 975 P.2d 723, 746–47 (Colo.), *cert. denied,* 528 U.S. 893, 120 S.Ct. 221, 145 L.Ed.2d 186 (1999) (*quoting Young v. People,* 175 Colo. 461, 488 P.2d 567, 574 (1971)).

[¶ 80] According to the appellant, the victim's identity and the victim's physical condition at the scene were not disputed issues at trial and Officer Brackin was capable of testifying to these matters in the absence of the disputed photograph. The appellant's contention is essentially that the photograph was irrelevant or unnecessary in light of the "disputed" issues at trial and Officer Brackin's testimony regarding what he observed at the crime scene. We have previously rejected similar arguments, even when the defense has conceded or stipulated to elements of a crime. In *Wilks,* 2002 WY 100, ¶ 13, 49 P.3d at 983, we stated that "[s]ince the prosecution has the burden of proving all the elements of a crime, relevant photographs do not become inadmissible because the defendant concedes the fact and cause of the victim's death." *See also Seyle v. State,* 584 P.2d 1081, 1084 (Wyo.1978). Similarly, in *Barnes,* 858 P.2d at 526–28, after stating that relevant photographs do not become inadmis-

---

25. The appellant does not argue that the photograph incorrectly portrayed the subject matter or conveyed a false impression.

sible because the defendant concedes the fact and cause of the victim's death, we said:

> Following defendant's stipulation, it was argued that the photographs were cumulative and unnecessary. Such claim does not deal with relevancy but concerns the quantum and sufficiency of evidence. Evidence has never been held irrelevant because there was other evidence that may prove the same facts. Rather, the test of relevancy, found in W.R.E. 401, is one of reasonableness and common sense and is to be liberally applied to favor admissibility rather than exclusion of evidence. . . .
>
> . . .
>
> Appellant's position is that, conceding the nature, extent and severity of the injuries as necessary and relevant, the pathologist could orally testify to facts that would describe the injuries sufficiently for the jury to comprehend their magnitude. We trust juries to decide cases involving gory, gruesome killings and decide questions of life and death. It is inconsistent that we must sanitize the case by withholding fair evidence of the crime and its results.

[¶ 81] The appellant also argues that the photograph was "unduly prejudicial." According to the appellant, the photograph was "gruesome" because blood is visible around the victim's face, the victim's "empty pant leg is dangling," and it "graphically portrayed the victim, lodged in the vehicle, with the amputation of the foot obvious from the dangling pant leg." The appellant further argues that the photograph was introduced solely to inflame the jury because it "appears that the photograph may have been used pointedly during closing argument."

26. An object near the bottom of the victim's pant leg is not readily identifiable from the photograph. The appellant does not argue that this object was the muscle tissue Officer Brackin described.

27. The parties stipulated to introducing a copy of the coroner's report into evidence. The coroner's report describes the victim's injuries as follows:

> His neck was broken, as were his ribs and sternum. He had fractures of the right and left humerus, left ulna and radius, a fracture or dislocation of the right shoulder, fracture of

[¶ 82] The photograph depicts the position of the victim's body (fully clothed) in the minivan, with the victim's head near the crease of the passenger's seat and his legs on the dashboard near the minivan's shattered windshield. The victim's body is facing away from the camera, a small amount of blood is visible on the passenger seat near the victim's face, and a portion of the victim's apparently empty pant leg is also visible.[26] However, considering the nature of the severe impact between the minivan and the victim, and the victim's resulting injuries as described in the coroner's report[27] and by Officer Brackin, the photograph was likely less gruesome than would be expected under the circumstances and certainly was not extremely inflammatory on its face.

[¶ 83] Contrary to the appellant's argument, the record does not clearly show that the prosecutor referred to the photograph during his closing argument. The relevant portion of the prosecutor's closing argument follows:

> As the minivan approaches the intersection of Wasatch and Harrison Drive, the driver fails to make the turn. He fails to make this turn. He basically—in a timely manner. He does try to turn, but he doesn't start his turn until he gets up on the sidewalk. His reactions are slow because of—because of his intoxication.
>
> At Point A, at this point, on the sidewalk where he comes up over the curb, a minimum speed of 70 mile an hour. So he's going at least 70. He follows along at Point C, where the officers were able to determine was the area of impact. This is not exactly where Donald Walker was. Nobody knows exactly where he was. But he was in this area. Because of the dam-

the left femur, compound fracture of the right femur, fracture of the right tibia and fibula, amputation of the left lower leg approximately six inches above the ankle joint which was due to a complete fracture of the left tibia and fibula from the impact of the front of the vehicle.

His right and left carotid arteries were completely torn, as were his trachea and esophagus due to high speed impact injury.

There were also abrasions on the victim's face and hands, as well as on[e] deep laceration on the chin.

age to the vehicle and the mark on the sidewalk were consistent, that is the area that he was at. At that point, the vehicle—this point where there's a little scuff mark, there is an estimated speed, a minimum speed, of 63 mile an hour when he hit Donald Walker. When he hit Mr. Walker and he did this to him. (Indicating all the while.).

The only place that they got a definite speed for the green minivan that Mr. Whitney was driving was here at Point F.

The "points" to which the prosecutor referred (Point A, Point C, and Point F) coincide with locations depicted in State's Exhibits 17 and 17A. Exhibit 17 is a scale diagram of the crime scene, and Exhibit 17A is a legend for the various "points" depicted in Exhibit 17.[28] According to the record, the prosecutor was "[i]ndicating all the while" during this portion of his closing argument; however, given the context of the prosecutor's argument, Exhibit 17 is the only ascertainable exhibit to which the prosecutor might have been "indicating."

[¶ 84] Accordingly, the appellant has failed to establish a clear abuse of discretion (and thereby an error that transgressed a clear and unequivocal rule of law) by the district court in admitting this single photograph into evidence. *See generally also People v. Viduya,* 703 P.2d 1281, 1291 (Colo. 1985); *Munden v. State,* 698 P.2d 621, 626 (Wyo.1985); *Collins v. State,* 589 P.2d 1283, 1291 (Wyo.1979); and *Seyle,* 584 P.2d at 1084.

*PROSECUTOR'S REMARKS DURING OPENING STATEMENT AND CLOSING ARGUMENT*

[¶ 85] The appellant contends that the prosecutor made several remarks during his opening statement and principal closing argument that amounted to improper victim impact statements and improperly implied that a guilty verdict was the only way to give the victim and his family "closure" and "justice." We review allegations of prosecutorial misconduct " 'by reference to the entire record.' " *Mazurek v. State,* 10 P.3d

531, 542 (Wyo.2000) (*quoting English v. State,* 982 P.2d 139, 143 (Wyo.1999)). Such allegations " 'hinge on whether a defendant's case has been so prejudiced as to constitute denial of a fair trial.' " *Mazurek,* 10 P.3d at 542 (*quoting English,* 982 P.2d at 143).

Prosecutorial misconduct "has always been condemned in this state." *Valerio v. State,* 527 P.2d 154, 156 (Wyo.1974). Whether such misconduct has been reviewed on the basis of harmless error, W.R.Cr.P. 52(a) and W.R.A.P. 9.04, or on the basis of plain error, W.R.Cr.P. 52(b) and W.R.A.P. 9.05, this Court has focused on whether such error ... affected the accused's "substantial rights." The accused's right to a fair trial is a substantial right. Wyo. Const. art. 1, §§ 6, 9, and 10; *and see, e.g., Jones v. State,* 580 P.2d 1150, 1154 (Wyo.1978). Before we hold that an error has affected an accused's substantial right, thus requiring reversal of a conviction, we must conclude that, based on the entire record, a reasonable possibility exists that, in the absence of the error, the verdict might have been more favorable to the accused. *Jones v. State,* 735 P.2d 699, 703 (Wyo.1987). We read this standard to be in consonance with the standard followed by the United States Supreme Court[.]

*Earll v. State,* 2001 WY 66, ¶ 9, 29 P.3d 787, 789–90 (Wyo.2001). *See also Lancaster,* 2002 WY 45, ¶ 31, 43 P.3d at 93–94. The appellant bears the burden of establishing prosecutorial misconduct. *Id.,* 2002 WY 45, ¶ 32, 43 P.3d at 94.

[¶ 86] We have said the following with regard to opening statements:

"An opening statement has a narrow purpose and scope. It is to state what evidence will be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony to the whole; it is not an occasion for argument. To make statements which will not or cannot be supported by proof is, if it relates to significant elements of the case, professional

---

28. According to Exhibit 17A, Point A is where the right front tire of the minivan "jumps the curb," Point C is the "area of impact, pedestrian," and Point F is where the pedestrian's hat was located.

misconduct. Moreover, it is fundamentally unfair to an opposing party to allow an attorney, with the standing and prestige inherent in being an officer of the court, to present to the jury statements not susceptible of proof but intended to influence the jury in reaching a verdict."

*Hopkinson v. State,* 632 P.2d 79, 112 (Wyo. 1981), *cert. denied,* 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982), *cert. denied,* 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983) (*quoting United States v. Dinitz,* 424 U.S. 600, 612, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976), *cert. denied,* 429 U.S. 1104, 97 S.Ct. 1133, 51 L.Ed.2d 556 (1977)). Further, the

> prosecutor's opening statement should be confined to a statement of the issues in the case and the evidence the prosecutor · intends to offer which the prosecutor believes in good faith will be available and admissible. A prosecutor should not allude to any evidence unless there is a good faith and reasonable basis for believing that such evidence will be tendered and admitted in evidence.

ABA Standards for Criminal Justice 3–5.5 at 99–100 (3rd ed.1993). The commentary to Standard 3–5.5 states:

> The primary purpose of the opening statement is to give the prosecutor an opportunity to outline the issues and matters he or she believes can and will be supported by competent and admissible evidence introduced during the trial. In that statement, the prosecutor should scrupulously avoid any utterance that he or she believes cannot and will not later actually be supported with such evidence. If, through honest inadvertence, the proof actually offered at trial falls significantly short of points made in the opening statement, the court should be asked to give a clarifying instruction to avoid either advantage or penalty. In other respects, the opening statement is governed by the Standard for closing argument.

*Id.* (footnote omitted).

[¶ 87] Closing arguments

> must be based upon the evidence submitted to the jury. The purpose of closing argument is to allow counsel to offer ways of viewing the significance of the evidence.

*Hopkinson v. State,* 632 P.2d 79, 145 (Wyo. 1981). Prosecutors, just like defense counsel, may review the evidence and suggest to the jury inferences based thereon.... There are limits, however, on prosecutor's closing arguments that are designed to insure the fairness of the trial and prevent compromise of the judicial system.

*Dysthe v. State,* 2003 WY 20, ¶ 24, 63 P.3d 875, 884–85 (Wyo.2003). In *Wilks,* 2002 WY 100, ¶ 27, 49 P.3d at 986–87 (*quoting* I A.B.A., Standards for Criminal Justice 3–5.8 at 3.87 to 3.88 (2d ed.1980)), we stated:

> In *Trujillo v. State,* 2002 WY 51, ¶ 5, 44 P.3d 22, ¶ 5 (Wyo.2002), this court set forth the following broad guidelines found in the Standards for Criminal Justice which are applicable to a prosecutor's arguments to a jury:
>
>> "(a) The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.
>>
>> . . .
>>
>> (c) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.
>>
>> (d) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.
>>
>> (e) It is the responsibility of the court to ensure that final argument to the jury is kept within proper, accepted bounds."

[¶ 88] In the instant case, the prosecutor said the following during his opening statement (the remarks to which the appellant attributes error are italicized):

> The path through life has many twists and turns. The path each of us takes intersects with the lives of other people. However brief that may be, it can have a lasting impact upon those other lives. Each choice we make in life is like a cross-

roads. Some choices will lead us down the brightly lit streets. Others will lead us down dark and dangerous alleys. It just depends on what the choice is.

Donald Walker took a path that, unfortunately, led him into contact with the intersecting path of Harold Whitney, Jr., the Defendant sitting here. That occurred on September 29, 2001. The path that he took, though brightly lit, was a dead end, thanks to the path that Harold Whitney took. *Donald Walker was a father, a son, a brother and a friend. He would go without so that the people he loved could have the things they needed.*

Donald Walker's path during the early morning hours of September 29 . . . consisted of walking to where he was staying after meeting with friends to discuss a hunting trip that he was leaving on the next morning.

The prosecutor continued by describing the appellant's "path" in drinking at local establishments, interacting with Officer Vranish, and crashing the vehicle he was driving.

*In the brief moment that Harold Whitney's path crossed that of Donny Walker, lives were shattered forever. Children lost a father. Parents lost a son. And siblings lost a brother.* The evidence will show that Harold Whitney was traveling between 80 and 85 miles per hour when he struck Donald Walker, killing him. We'll further show that due to his intoxication, due to his delayed reaction time, he wasn't able to make the corner at that speed. He went up over the curb, followed the curb for almost 200 feet, a little over 200 feet, and struck Donny Walker. The impact was so severe from the impact that Donald Walker's jeans were imbedded into the bumper of the minivan. Donny Walker broke—broke both of his legs, both of his arms, broke his neck, broke his back, his ribs. The impact was so severe that Donald Walker's left foot was found 273 feet from the area of impact.

The prosecutor made the following remarks during his principal closing argument:

But today, we're nearing the end of a long and rocky road that took over a year to complete, or at least to get to this point. For some, the path has been shorter. For most—most of you, that journey that started on September 29, 2001, will end when a verdict is reached. For others, the journey has just begun. *For Donald Walker's family, it will never end.*

■■■■ [¶ 89] The remarks at issue focus on the effect of the victim's death upon his family or others. "Consideration of victim-impact testimony or argument remains inappropriate during proceedings determining the guilt of an accused." *Armstrong v. State,* 826 P.2d 1106, 1116 (Wyo.1992). Generally, the

> key inquiry on the admissibility of victim impact testimony during the guilt phase of a criminal trial is relevancy. *McCone v. State,* 866 P.2d 740, 751 (Wyo.1993). Victim impact testimony must not be permitted "unless there is a clear justification of relevance." *Justice v. State,* 775 P.2d 1002, 1011 (Wyo.1989). Such testimony may be irrelevant if offered during the guilt phase of the trial as proof of the victim's loss; the physical, emotional, or psychological impact on the victim; or the effect upon the family. Yet, it may be relevant if offered for another proper purpose. *Id.* at 1010.

*Wilks,* 2002 WY 100, ¶ 8, 49 P.3d at 981.

[¶ 90] The State does not contend that the prosecutor's remarks were relevant to any trial issue or evidentiary purpose other than the effect of the victim's death upon his family or others, and concedes in its appellate brief that the remarks "did, admittedly, inject into the trial issues broader than Appellant's guilt or innocence." We note that the statements also implicate other areas of impropriety. It does not appear that the remarks made during the prosecutor's opening statement related to any evidence the prosecutor intended to offer at trial,[29] or that the remark made during the prosecutor's principal closing argument was a reasonable

---

**29.** There is no indication in the record (particularly the respective witness lists filed by the parties) that either party intended to call a member of the victim's family, or a friend of the victim, as a trial witness.

inference based on any evidence actually introduced at trial. The remarks also risked inflaming the passions of the jury by creating sympathy for the victim, and the victim's family and friends.

[¶ 91] However, based on our review of the entire record, we do not find that the prosecutor's remarks prejudiced the appellant to a degree that requires reversal and a new trial. The appellant did not object to the referenced remarks at trial.

> In *Mazurek v. State,* 10 P.3d at 539, this court listed several non-exhaustive factors to be utilized to evaluate whether there was prejudicial plain error at the trial level as a result of prosecutorial misconduct. Those factors ... include 1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and prejudice the accused; 2) whether the remarks were isolated or extensive; 3) the strength of competent proof to establish guilt, absent the remarks; 4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters; 5) the presence or absence of a limiting instruction; 6) whether the error was invited by defense counsel; 7) whether the failure to object could have been the result of tactical decisions; and 8) whether, in light of all the evidence, the error was harmless.

*Trujillo v. State,* 2002 WY 51, ¶ 15, 44 P.3d 22, 28 (Wyo.2002).

■ [¶ 92] On appeal, the appellant argues only that the prosecutor's remarks prejudiced him because the appellant mounted a "challenging defense" at trial regarding Officer Vranish's alleged role in proximately causing the victim's death, and "remarks that elicited sympathy for the grieving family must have made the jury more inclined to find [the appellant] guilty." We find that, based on a careful review of the record, the evidence of the appellant's guilt was overwhelming, the prosecutor's remarks were relatively isolated, and the district court instructed the jury as follows immediately prior to the prosecutor's opening statement:

> On the other hand, it is the exclusive province of the Jury to weigh and consider all evidence which is presented to it; to determine the credibility of all witnesses

who testify before you, and from such evidence and testimony, to determine the issues of fact in this case.

> This duty you shall perform with sincere judgment and sound discretion, uninfluenced by sentiment, conjecture, or by passion or prejudice against any of the litigants in this case, or by public opinion or public feeling. The litigants have the right to demand and expect that you will conscientiously and dispassionately consider and weigh the evidence and apply the law of the case, and that you will reach a just verdict, regardless of the consequences. That verdict must express the individual opinion of each Juror.

> You are the exclusive judges of the facts and of the effect and value of the evidence, but you must determine the facts from the evidence produced here in court. If any evidence is admitted and afterwards is ordered by me to be stricken out, you must disregard entirely the matter thus stricken, and if any counsel intimates by any of his questions that certain hinted facts are, or are not, true, you must disregard any such intimation and must not draw any inference from it. As to any statement made by counsel in your presence concerning the facts of the case, you must not regard such a statement as evidence[.]

The district court also gave the jury a nearly identical instruction immediately prior to the prosecutor's principal closing argument. Accordingly, weighing all of the factors against the record as a whole, we do not think a reasonable possibility exists that in the absence of the prosecutor's remarks, the verdict might have been more favorable to the appellant or that the remarks put the fairness of the trial into serious question.

[¶ 93] The appellant also contends that the prosecutor improperly implied that the only " 'just' conclusion the jury could reach after listening to the evidence would be to find [the appellant] guilty." After detailing the elements of the charged offenses, the prosecutor concluded his opening statement with the following remarks:

> After all the evidence is heard regarding these charges, you will have to choose your path, both individually and collectively. *I*

*know that you'll do what's right.  I know that you will choose the correct path.  Give the Walker family some closure.  Give them justice.  Give Donald Walker justice.*  Thank you.

(Emphasis added.)  The appellant objected to these remarks.  In response to that objection, the district court instructed the jury as follows:

Ladies and Gentlemen of the Jury, there's been an objection raised to the State's opening statement regarding what the State wished the Jury to do.  The function of an opening statement is to inform the Jury of the evidence that a party wishes to present and it's not an appropriate time to make an argument.  That is customarily reserved to closing argument.  The Jury will disregard the closing statements made in the State's opening statement.

[¶ 94]  It does not appear that the prosecutor's remarks comport with the standards we previously set forth regarding the proper purpose and scope of an opening statement.  In addition, " 'an exhortation to the jury to "do the right thing," . . . is error if it "impl[ies] that, in order to do so, it can only reach a certain verdict regardless of its duty to weigh the evidence and follow the court's instructions on the law" ' " and "may also run afoul of the admonition against injecting issues broader than the guilt or innocence of the accused." *Wilks*, 2002 WY 100, ¶ 28, 49 P.3d at 987 (*quoting Jackson v. State*, 791 So.2d 979, 1026 (Ala.Crim.App. 2000), *cert. denied*, 532 U.S. 934, 121 S.Ct. 1387, 149 L.Ed.2d 311 (2001) and *Arthur v. State*, 575 So.2d 1165, 1185 (Ala.Crim.App. 1990), *aff'd*, 711 So.2d 1097 (Ala.1997), *cert. denied*, 535 U.S. 1053, 122 S.Ct. 1909, 152 L.Ed.2d 819 (2002)).

[¶ 95]  We note that the prosecutor did preface the remarks at issue by stating that the jurors, individually and collectively, would have to choose their own "path," after hearing all of the evidence.  However, to the extent that the remarks might arguably have implied that only a guilty verdict would give the victim and his family "closure" or "justice," we cannot say that the appellant was prejudiced to a degree that requires reversal and a new trial: (1) the evidence of the appellant's guilt was overwhelming; (2) the district court gave the aforementioned jury instruction immediately prior to the prosecutor's opening statement;  and (3) the district court also specifically instructed the jury to disregard the prosecutor's remarks immediately after they occurred.

[¶ 96]  We affirm.